IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ROBERT P. RUBANO,     )
            )
 Plaintiff,      )
            )  Civil Action No. 11-1574
    v.      )
            )  Chief Magistrate Judge Lisa Pupo
FARRELL AREA SCHOOL DISTRICT, )  Lenihan
            )
 Defendant.      )  ECF No. 29
            )


**OPINION**

LENIHAN, M.J.

   Currently before the Court for disposition is Defendant's Motion for Summary Judgment

pursuant to FED.R.CIV.P. 56 and Western District of Pennsylvania Local Rule 56.1 (ECF No.

29). In this employment discrimination case, Plaintiff, Robert P. Rubano, contends that

Defendant, Farrell Area School District (the "District") discriminated against him by regarding

him as disabled within the meaning of the Americans with Disabilities Act of 1990, 42 U.S.C.

§§12101 *et seq.* ("ADA"), as amended by the ADA Amendments Act of 2008, Pub. L. No. 110-

325, 122 Stat. 3553 ("ADAAA"). Rubano contends that because of his perceived disability, the

District, through its agents/employees, discriminated against him when it subjected him to a

hostile work environment, demoted him, and retaliated against him, in violation of the ADA,

ADAAA, and the Pennsylvania Human Relations Act, 43 Pa. Cons. Stat. §951 *et seq.* ("PHRA").

As a result, Rubano claims that he suffered a loss of wages from July 1, 2010 to present, loss of

pension, insurance and other benefits, suffered personal injury and harm, humiliation,

embarrassment, loss of self-esteem, adverse health effects, and loss of time and money in

endeavoring to protect himself from the District's unlawful discrimination. Rubano further

contends that the District retaliated against him based on his filing charges of discrimination with

the EEOC.

This Court has subject matter jurisdiction over the federal claims pursuant to 28 U.S.C.

§1331 and 42 U.S.C. §12111, and has supplement jurisdiction pursuant to 28 U.S.C. §1367 over

the PHRA claims.

For the reasons set forth below, the Court finds that no material issues of fact exist and

that the District is entitled to judgment in its favor as a matter of law. Accordingly, the Court

will grant the District's motion for summary judgment.

## I.    MATERIAL FACTS

The material facts are largely undisputed.[1] In 1997, the Farrell Area School District (the

"District") hired Plaintiff, Robert Rubano, as a member of its maintenance department. Initially,

Rubano was hired as extra summer help, and thereafter, he was hired as a full-time employee of

the maintenance department. As a full-time employee of the maintenance department, Rubano

was a member of the American Federal of State, County and Municipal Employees Union.

In 2001, Rubano was promoted to the position of maintenance/custodial foreman. This

promotion resulted in Rubano supervising members of the maintenance and custodial

departments and receiving a pay increase to between $15 and $16 per hour. While working in the

maintenance department, Rubano also obtained certifications with regard to pool chemicals,

---

[1] Plaintiff has admitted a substantial number of Defendant's Concise Statements of Material Fact
("Def. CSMF"), and therefore, those undisputed statements have been reiterated here almost
verbatim without citation to the record.   As to the facts which Plaintiff disputes, the Court will
examine the evidence cited in support and determine whether a material issue of fact actually
exists.

pesticides and playground maintenance, which allowed him to perform a variety of maintenance functions.

Beginning in 2002, Rubano testified that he began feeling symptoms of depression. Rubano testified that those symptoms persisted, with varying degrees of intensity, between 2002 and 2009. During that time period, his symptoms increased in severity during times of stress, such as the divorce from his second wife. Rubano also testified that in June 2009, his working conditions began affecting his then undiagnosed depression. Rubano did not believe that any member of the District, other than his brother who had previously served as the District's superintendent, was aware of his depression.

Between January of 2009 and May of 2010, Rubano testified that he was subjected to a hostile work environment, albeit not due to a perceived disability. (Rubano Dep. at 80.) The alleged harassment during this period began in January 2009 when he was allegedly slandered by the then- President of the School Board, Marcina Cimoric, at the Board meeting, when she stated that he botched a District renovation project, which was untrue. (Rubano Dep. at 57-58.)[2] In June of 2009, Rubano testified that his depression intensified over a project assigned to him by the business manager at the time, Mike Stabile, to remodel the press box at the football field. Rubano had to complete the project alone in a specific amount of time, which required 60 hours of overtime to complete while performing his usual duties as supervisor/foreman of maintenance. (Rubano Dep. at 52.)

In November 2009, the Board of School Directors (the "Board") decided to create a new Director of Buildings and Grounds position that would supervise all maintenance and janitorial

---

[2] Rubano believes that Cimoric came after him because she was angry with his brother's Richard Rubano's handling of an employee while Richard was the superintendent years before 2009. (Rubano Dep. at 59.)

staff. This would be a supervisory position occupied by a non-Union employee. Although made aware of this position's creation, Rubano never applied for it, because Mike Stabile told him that the Board wanted him fired. The Director of Building and Grounds position, as a non-Union position, would not be covered by the collective bargaining agreement that applied to Rubano's current position and, therefore would not include that agreement's protections.

As a result of Cimoric's alleged defamatory statements in January of 2009 and her displeasure with Richard Rubano's handling of an employment matter, Rubano believed that Cimoric wanted him fired in November 2009. Rubano also believed that because of Cimoric's dislike for him, in June of 2009 he was assigned the difficult press box remodeling project by Mike Stabile. This personal issue between Rubano and Cimoric is the only reason Rubano believed any Board member would want to fire him in 2009:

> Q. Okay. And so you think that is--when Mike Stabile said the Board wants to fire you, you think it was a result of that, her wanting to come after you because you were--because of your brother.
>
> A. Yes.
>
> Q. Can you think of any other reasons why they wanted to fire you?
>
> A. No.

Rubano Dep. at 59-60 (ECF No. 33-3). In fact, according to Rubano, from January 2009 through November 2009, he was assigned the difficult press box remodeling project and told not to apply for the Director of Buildings and Grounds position solely because Cimoric did not like him:

> Q. Did you feel they were going after you because of the things Mrs. Cimioric (sic) had said?
>
> A. Absolutely.

Q. Do you think there was any other reason they were going after
you?

A. No.

*Id.* at 62. According to Fred Fry, one of Rubano's co-workers in the maintenance department, he

in fact advised Rubano not to apply for the Director of Buildings and Grounds position because it

would require Rubano to leave the Union and lose the protections provided by Union

membership.

In March 2010, Dan Harkless was hired for the newly created position of Director of

Buildings and Grounds. Almost immediately after Harkless was hired in March 2010, Rubano

submits that his work conditions worsened. (Rubano Dep. at 86-94.) In particular, Rubano

testified that beginning in March of 2010, Harkless made derogatory comments about him and

the other two full-time maintenance employees, Fry and Myers (*id.* at 86-89), and assigned

impossible to complete work orders/tasks (*id.* at 89-90).

In addition, Rubano alleges that after Harkless started, he immediately began taking away

certain jobs that Rubano previously performed while simultaneously increasing the number of

work orders that had to be completed. For instance, with regard to his responsibilities for

playground inspections, Rubano testified:

Q. Playground inspection, when was that job responsibility--when
was your responsibility affected? When was that taken away?

A. I believe that was taken away just for the weekend at the same
time.

Q. Okay. So shortly after you returned from medical leave.

A. It was actually before that.

Q. Okay. Sometime between March and May of 2010 that was
taken away.

A. I believe it was taken away, again, on the weekends around April.

Q. On the weekends, I'm assuming that would have been overtime work.

A. Correct.

Q. Was that work that you had traditionally done?

A. Yes.

Q. Did anyone else do that work?

A. No. I was the only one certified.

Q. What certification is associated with the playground work?

. . .

A. It's just an inspector; playground inspector.

Q. When did you get that certification?

A. Actually, I had that inspection for quite a few years.

Q. Okay. How long had you been the only person who had that certification?

A. Three years I was the only one.

Q. Okay. And you said that was taken away from you, maybe, around April of 2010, the work?

A. Yes.

Q. Who performed the work then after it was taken away from you?

A. I still had to go out and do it after I came back, but just for short time.

Q. But who did it after you?

A. Dan Harkless started to do it.

Q. Was he certified?

A. No.

Rubano Dep. at 66-68.

In late April 2010, Rubano also e-mailed Harkless complaining about the outsourcing of lawn care to a third-party contractor, rather than allowing maintenance employees to perform that work as overtime hours.[3] These negative work conditions began prior to when Rubano submitted his FMLA documents. (*Id.* at 69.) On April 25, 2010, Rubano filed his first union grievance alleging that Harkless was harassing him.

Sometime between May 18, 2010 and June 1, 2010, Rubano submitted a request for leave under the Family Medical Leave Act ("FMLA") to the District. (Rubano Dep. at 69.)[4] Rubano's

---

[3] The content of the e-mail stated:
> Dan, just a reminder, please review the union contract carefully. Article VI Section 3 clearly states, "No outside help (paid help) will be used where and when the employees of said district can furnish such help". The maintenance department can perform lawn care after hours as needed as overtime. The cost is the same. Bob.

4/29/10 Email from Rubano to Harkless, Ex. K to Def.'s App. (ECF No. 33-11 at 2). In a reply email, Harkless stated to Rubano:
> This work was hired out last year and I was asked to look into doing so again this year. We are currently not getting the mowing all done properly and do not have time to do some of the other things we should be doing because it is taking so long. If there is a union concern we should have a meeting about it with Lora [Adams-King], Bill [Dungee] and Debbie [Currie] before proceeding. I do not think the cost is the same even if we could do it on straight time but the decision whether to do it is above my pay grade.

*Id.*, ECF No. 33-11 at 1-2. In a follow-up email to Rubano on May 4, 2010, Harkless wrote:
> I talked with Debbie Currie. She said that we can outsource the mowing the same as we did last year as long as doing so does not cause any lay-offs. I assured her that we will have plenty of work to do this summer without mowing. She advised that the school is not obligated to provide overtime to the union employees.

*Id.*, ECF No. 33-11 at 1.

[4] Rubano's letter to the District requesting FMLA leave is undated, but the Certification of

FMLA request came approximately three months after Harkless became the Director of Buildings and Grounds, and several weeks after Rubano filed his first union grievance claiming that Harkless was harassing him. His leave was approved by the School Board on June 14, 2010 and began on June 15, 2010. (Ex. L, Def.'s App., ECF No. 33-12 at 1-2; Rubano Dep. at 70.) Rubano returned to work from his FMLA leave on September 27, 2010. (Rubano Dep. at 70.)

Within his FMLA request, Rubano indicated that a psychological issue necessitated his leave. Rubano admits that, prior to submitting his request for FMLA leave, he never informed any District administrator of his depression. The only District employees whom he informed of his depression were his coworkers, Fred Fry and Dave Myers, both of whom testified that they never told anyone about Rubano's depression. From the summary judgment record, it appears that between January 2009 and the submission of his FMLA request in late May of 2010, no District administrator or Board member had any knowledge of Rubano's depression. Rubano admits that, prior to submitting his request for FMLA leave, he had no reason to believe that anyone at the District, other than Fred Frye and Dave Myers, knew about his depression. Rubano Dep. at 79-80. In addition, there is no evidence in the summary judgment record to show that any member of the District's 2010, 2011 or 2012 administration was ever told of Rubano's psychological condition or had ever seen any evidence of that condition prior to his FMLA leave. In fact, Rubano testified that no member of the District's administration or Board ever mentioned his depression, nor did anyone indicate that Rubano's depression precluded him from performing any work.

---

Health Care Provider submitted in support of FMLA leave is signed and dated by Dr. Scott and Rubano on May 18, 2010. *See* Ex. L, Def.'s App., ECF No. 33-12 at 2, 10. Thus, it appears unlikely that Rubano would have submitted the request on May 11, 2010, as he speculated in his deposition testimony (Rubano Dep. at 69), as he did not yet have the required documentation.

On July 1, 2010, while Rubano was on FMLA leave, he was demoted from foreman to work team leader, which involved a reduction in responsibilities and pay, and a change from salaried position to hourly wage. Rubano Dep. at 81-83. Rubano received the paperwork regarding his demotion while he was on FMLA leave. *Id.* at 85.

Before his FMLA leave, Rubano and his co-workers complained of reduced overtime opportunities, a substantial increase in work orders, and being assigned to work alone on projects that would normally require several people to complete, and derogatory comments. Def. CSMF ¶47 (citing Rubano Dep. at 135-36); Pl.'s Resp. to Def. CSMF ¶47, ECF No. 36 (citing Def. CSMF ¶32; Rubano Dep. at 64-65, 89-90; Fry Dep. at 18-19 (ECF No. 33-8); Myers Dep. at 12-13 (ECF No. 33-14)). In addition, Rubano complains that his responsibilities for pool testing and playground inspections were taken away when Harkless took over as Director of Buildings and Grounds. (Rubano Dep. at 65.)[5]

The other two full-time employees in the maintenance department—Fred Fry and David Myers—testified that they too experienced some of the same negative working conditions as Rubano experienced after Harkless took over as Director of Buildings and Grounds. For example, Myers testified that all maintenance employees saw a reduction in overtime/income after Harkless was hired. (Myers Dep. at 14, 18-19, Ex. M to Def.'s App., ECF No. 33-14). In particular, Fry testified that Harkless no longer allowed him, Myers and Rubano to work basketball games, resulting in a reduction in overtime. (Fry Dep. at 28, 37, Ex. H to Def.'s App., ECF No. 33-8.) Fry also testified that Harkless kept turning the heat down to 50 degrees in the

---

[5] In particular, Rubano testified that the pool testing responsibilities were taken away on April 23, 2010, but that he continued to do it up until his medical leave. Rubano Dep. at 65-66. While Rubano was on leave, Harkless hired an outside company to perform the pool testing until approximately one year later when Harkless received certification to do it himself. *Id.* The playground inspections on the weekends, which would have been overtime work, were also

garages where they worked when the outside temperature was 25 to 30 degrees. (Fry Dep. at 18, 36.) Myers testified that there were jobs that should have two people assigned to them but Harkless had them work separately (Myers Dep. at 9, 15-16, 19-20), and that Harkless was checking up on them (*id.* at 15). Fry and Myers also testified that the difference in Harkless' management style—disorganized, didn't understand the maintenance area at all, didn't know what he was doing, work was rushed, and a lack of communication with staff regarding work assignments—created a stressful work environment for everyone. Fry Dep. at 19, 29; Myers Dep. at 11-13, 20-21.

Comparing the two periods of time—one starting from January 2009 and ending on September 27, 2010, and the second one starting the day after Rubano filed his first EEOC charge—Rubano testified:

> Q. If you were going to compare the two periods of time, one is from January of '09 when you were defamed up through your coming back to work in September of '10, and the second period of time is from October 11th of 2010, a day after you filed your first charge, until the present, if you are going to compare those two periods of time, is there one of the two that is more egregious, more hostile, more harassing?
>
> A. Starting with October of 2009, or of October 2010?
>
> Q. Let me rephrase it again. If you don't understand the question, that's fine. I'm asking you to compare two hostile work environment periods.
>
> A. Okay.
>
> Q. One, let's assume, started in January of '09. Got that?
>
> A. Yes.
>
> Q. And ended when you filed--just a day or so before you filed your first charge in October of '10, okay?

<hr>

taken away from Rubano in April of 2010. *Id.* at 66-67.

A. Okay.

Q. The second one starts the day after you filed your first charge in October of '10 and continues until today, all right, November 28th of '12. Okay? Do you have those two periods?

A. Yes.

Q. Which of the two would you say has been more egregious, more hostile, or more harassing?

A. It hasn't changed. They're both the same.

Rubano Dep. at 135-36.

Nonetheless, Rubano contends that following his return from FMLA leave, the working conditions were different. Specifically, Rubano states that after he returned from FMLA leave, he was assigned to the Hechter Building, which is owned by the District and rented out as a daycare and family center. Rubano Dep. at 105. While working at the Hechter Building, Rubano was isolated from his co-workers and was not permitted to leave the building; if he needed anything for the remodeling work he was performing, it had to be brought to him. Rubano Dep. at 105-06.

In addition, Rubano testified that after his return from FMLA leave, Harkless kept his name off the overtime list (Rubano Dep. at 90-91, 96), which stands in contrast to Harkless' representation that District "keep[s] a list of who has opportunity to have overtime. It's equalized among all the employees based on an ongoing list. . . . The person who has had—there's a list that's developed for each overtime opportunity, and the—when the overtime opportunity comes up, the person who has the lowest number of previous opportunity for overtime is offered the assignment." Harkless Dep. at 27-28 (ECF No. 33-6). However, Rubano further testified that the reduction in overtime opportunities was due to Harkless' determination that certain overtime

tasks (e.g., opening and closing the school for various sporting events), were not maintenance functions, and were performed either by Harkless or part-time workers. Rubano Dep. at 91, 96-98. Also, Rubano testified that Harkless does not post overtime opportunities any longer for playground work or pool certifications. Rubano Dep. at 98.

William Dungee, the current business manager for the District, testified that additional work was given to part-time employees, thereby reducing the overtime of full-time employees, because it was less expensive for the District to hire a part-time employee to complete that work. (Dungee Dep. at 66-67.) According to Dungee, the District was operating in a financial deficit. (Dungee Dep. at 64.)

In April of 2011, Rubano discovered that Harkless was withholding his mail, some of which dated back to November of 2010. (Rubano Dep. at 99-100.) On June 16, 2011, Rubano wrote a letter to Harkless indicating that Harkless told him that Harkless withheld Rubano's mail, and that Rubano had not received any mail since around May 1, 2010. (Ex. N, Def.'s App., ECF No. 33-15.) Rubano further stated that the "withheld mail has a great deal to do with my recent illness"[6] and requested that all withheld mail be sent to his home by June 25, 2011. *Id.*

As a result of the alleged negative working conditions, Rubano filed a charge of discrimination with the EEOC dated October 8, 2010 ((EEOC Case No. 533-2011-00047), alleging discrimination based on disability and a retaliation claim. (Ex. O, Def.'s App., ECF No. 33-16.) On January 17, 2011 and September 19, 2011, Rubano submitted two more charges of discrimination with the EEOC (EEOC Case Nos. 533-2011-314 and 533-2011-1089,

---

[6] It appears that when Rubano learned that Harkless was withholding his mail in April of 2011, which caused some of his certifications to lapse, this exacerbated Rubano's depression necessitating a second FMLA leave beginning on May 7, 201l for sixty days. (Rubano Dep. at

respectively), alleging an ongoing hostile work environment based on a perceived disability and retaliation for filing the 10/8/10 EEOC charge (EEOC Case No. 533-2011-00047) and 1/17/11 Charge (EEOC Case No. 533-2011-00314). (Ex. P, Def.'s App., ECF No. 33-17.)

Dungee testified that he informed Harkless of the first EEOC charge filed by Rubano, but did not specifically inform Harkless of the two subsequent charges. (Dungee Dep. at 46, 48, 52-55.) Dungee explained his reason for doing so was that once the first charge was filed, Harkless already knew there was a discrimination case out there. (Dungee Dep. at 53.) Dungee testified that even though he did not specifically inform Harkless of the two subsequent EEOC charges, he had several discussions with Harkless about Rubano's accusations that Harkless was harassing Rubano. (Dungee Dep. at 55.)

On December 13, 2011, Rubano timely instituted this federal civil action after receiving right to sue letters dated September 19, 2011 from the EEOC with regard to the October 8, 2010 and January 17, 2011 Charges of Discrimination. (Compl. ¶21 and Attachments thereto at ECF No. 1-2.) The PHRA claims were exhausted only as to the October 8, 2010 charge. (Compl. ¶21.) Subsequently, after receiving the right to sue letter as to the September 19, 2011 charge and exhausting the other two PHRA claims, Rubano filed an Amended Complaint on June 20, 2012 (ECF No. 18). Discovery has now closed and the District has moved for summary judgment on all claims. The motion and response thereto have been fully briefed. Thus, the motion for summary judgment is ripe for disposition.

## II.    LEGAL STANDARD – SUMMARY JUDGMENT

Summary judgment is appropriate if, drawing all inferences in favor of the nonmoving party, "the movant shows that there is no genuine dispute as to any material fact and the movant

99-100; Ex. L, Def.'s App., ECF No. 33-12 at 3-7.)

is entitled to judgment as a matter of law." FED.R.CIV.P. 56(a). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of identifying evidence, or the lack thereof, which demonstrates the absence of a genuine issue of material fact. *Nat'l State Bank v. Fed'l Reserve Bank of New York*, 979 F.2d 1579, 1581-82 (3d Cir. 1992) (citing *Celotex,* 477 U.S. at 323-25). Once that burden has been met, the nonmoving party may not rest on the allegations in the complaint, but must "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex,* 477 U.S. at 324 (quoting FED. R. CIV. P. 56(e) (1963)). *See also Orsatti v. New Jersey State Police,* 71 F.3d 480, 484 (3d Cir. 1995) ("plaintiff cannot resist a properly supported motion for summary judgment merely by restating the allegations of his complaint, but must point to concrete evidence in the record that supports each and every essential element of his case.") (citing *Celotex, supra*).

Moreover, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986) (emphasis in original). As to materiality, the Supreme Court explained: "the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248 (citing 10A C. Wright, A. Miller, & M. Kane, FEDERAL PRACTICE AND PROCEDURE § 2725, pp.

93-95 (1983)).  As to whether an issue of material fact is genuine, the Court held that it will be genuine only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Id.* "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Id.* at 252.  Finally, while any evidence used to support or oppose a motion for summary judgment must be admissible, it is not necessary for it to be in admissible form.  *See* FED. R. CIV. P. 56(c)(2); *Celotex*, 477 U.S. at 324; *J.F. Feeser, Inc., v. Serv-A-Portion, Inc.*, 909 F.2d 1524, 1542 (3d Cir. 1990).

## III.   DISCUSSION

### A.   Disability Claims Under the ADA and PHRA[7]

The parties' arguments are not a model of clarity.  The District's opening brief analyzes Rubano's ADA and PHRA claims employing the McDonnell Douglas burden shifting analysis, while Rubano, in his responsive brief, opposes the District's argument pointing instead to the prima facie elements of a hostile work environment claim.  Rubano argues that although the District references the elements of a prima facie case for disability discrimination, the only element the District disputes is one that is identical under either theory—that plaintiff is a member of a protected class.  In its reply brief, the District disagrees with Rubano's assessment of its argument, pointing out that it was also arguing that Rubano failed to show that the alleged hostile work environment and/or adverse employment action was taken because of his disability.

---

[7] In the past, courts in this Circuit analyzed ADA and PHRA claims simultaneously, because the "PHRA [wa]s basically the same as the ADA in relevant respects, and 'Pennsylvania courts . . . generally interpret the PHRA in accord with its federal counterparts.'" *Rineheimer v. Cemcolift, Inc.,* 292 F.3d 375, 382 (3d Cir. 2002) (quoting *Kelly v. Drexel Univ.,* 94 F.3d 102, 105 (3d Cir. 1996)).  However, the ADAAA relaxed the ADA's standard for disability effective January 1, 2009, but the Pennsylvania legislature has failed to enact a similar amendment to the disability standard under the PHRA.  *Szarawara v. Cnty. of Montgomery,* Civ. A. No. 12-5714, 2013 WL 3230691, at *2 (E.D.Pa. June 27, 2013) (holding that the PHRA has not been amended like the ADAAA to relax the standard for disability, and therefore, it was necessary to analyze plaintiff's ADA and PHRA claims separately); *Deserne v. Madlyn & Leonard Abramson Ctr. for Jewish Life, Inc.,* Civ. A. No. 10-03694, 2012 WL 1758187, *3 n. 3 (E.D.Pa. May 17, 2012) ("To date, Pennsylvania has not made parallel amendments to the PHRA or the regulations implementing the PHRA."); *Canfield v. Movie Tavern, Inc.,* Civ. A. No. 13-cv-03484, 2013 WL 6506320, *5 (E.D.Pa. Dec. 12, 2013) (citing *Szarawara* and *Deserne, supra*).  *See also* 43 P.S. §954(p.1). Thus, while the disability standards are different, the remaining elements of Rubano's ADA and PHRA claims are essentially the same and can be analyzed together.   Although the District mistakenly analyzed Rubano's ADA claims under the pre-ADAAA disability standard, that analysis would apply to Rubano's PHRA claims.  Rubano has failed to recognize that the pre-ADAAA disability standard applies to his PHRA claims and provides no separate analysis of his PHRA claims under that standard.

The District also applied the wrong standard in analyzing whether Rubano established that he was disabled under the ADA.

In any event, to succeed on either claim, Rubano must, as a preliminary matter, show that he is a member of the protected class which, in this case, means he must establish that he is a person with a disability as defined under the ADA and PHRA.

### 1.     Whether Rubano is a Person With a Disability

#### a.     *Disability Under the ADA*

The ADA was amended by the ADA Amendments Act of 2008 ("ADAAA"), which took effect on January 1, 2009. Pub. L. No. 110-325, 122 Stat. 3553, 3559. In enacting the ADAAA, Congress has made clear that the "question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis[.]" ADAAA §2(b)(5), Pub. L. 110-325, S. 3406, 122 Stat. 3553, 3554 (2008). Indeed, Congress has instructed that in construing the definition of "disability" under the ADA, it "shall be construed in favor of broad coverage of individuals under [the ADA], to the maximum extent permitted by the terms of [the ADA]." 42 U.S.C. §12102(4)(A) (2009). *See also EEOC Interpretive Guidance on Title I of the ADA*, 29 CFR pt. 1630 App., §1630.1(c) (2011). Because the alleged acts forming the basis of Rubano's disability discrimination and hostile work environment claims occurred after January 1, 2009, the 2008 amendments to the ADA govern this case.

Under the ADA, an "individual with a disability" is defined as someone who (1) has a physical or mental impairment that substantially limits one or more major life activities; (2) has a record of such an impairment; or (3) is regarded as having such an impairment. 42 U.S.C. §12102(1); *Rinehimer v. Cemcolift, Inc.,* 292 F.3d 375, 380 (3d Cir. 2002) (citing *id.*). "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing,

hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working."   42 U.S.C. §12102(2)(A).

In the case at bar, Plaintiff is pursuing a disability discrimination claim under the "regarded as" prong of section 12102(1)(C).  The District contends that Rubano has failed to establish a prima facie case of discrimination because he cannot show that the District regarded him as disabled.  However, in support of its argument, the District incorrectly applies the pre-2008 amendments disability standard.

In keeping with its intent to construe the definition of disability in favor of broad coverage, Congress amended the definition of disability under the regarded as prong to read:

> (3) Regarded as having such an impairment
>
> For purposes of [Section 12102](1)(C):
>
>> (A) An individual meets the requirement of "being regarded as having such an impairment" if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.
>>
>> (B) Paragraph (1)(C) shall not apply to impairments that are transitory and minor. A transitory impairment is an impairment with an actual or expected duration of 6 months or less.

42 U.S.C. §12102(3) (2009).  The regulations provide further guidance as to how the "regarded as" prong should be construed:

> (1) Except as provided in §1630.15(f), an individual is "regarded as having such an impairment" if the individual is subjected to a prohibited action because of an actual or perceived physical or mental impairment, whether or not that impairment substantially limits, or is perceived to substantially limit, a major life activity. Prohibited actions include but are not limited to refusal to hire, demotion, placement on involuntary leave, termination, exclusion

for failure to meet a qualification standard, harassment, or denial of any other term, condition, or privilege of employment

(2) Except as provided in §1630.15(f), an individual is "regarded as having such an impairment" any time a covered entity takes a prohibited action against the individual because of an actual or perceived impairment, even if the entity asserts, or may or does ultimately establish, a defense to such action.

(3) Establishing that an individual is "regarded as having such an impairment" does not, by itself, establish liability. Liability is established under title I of the ADA only when an individual proves that a covered entity discriminated on the basis of disability within the meaning of section 102 of the ADA, 42 U.S.C. §12112.

29 C.F.R. §1630.2(*l*) (Apr. 4, 2012). Thus, under the ADAAA, a plaintiff who is proceeding under the "regarded as" prong to establish a disability no longer needs to show that his impairment substantially limits a major life activity. 29 C.F.R. pt. 1630, app. §1630.2(j) (2011).

Rubano submits that the evidence establishes that the District regarded him as disabled under the new ADAAA disability standard. Specifically, Rubano argues that his impairment is neither transitory nor minor, as he has suffered from depression, in varying degrees of severity, since 2002, and when it is at its worst, he experiences panic attacks so severe that he is "incoherent and confused" and unable to function. The District does not address this argument. In addition, Rubano argues that he has presented evidence to show that the District treated him differently after he applied for FMLA leave and disclosed his condition, which should be sufficient to establish that Harkless did not believe that Rubano was still capable of fully performing his job after he returned from leave, and therefore, that Harkless regarded him as disabled. However, the latter argument actually incorporates the pre-2008 amendments standard for "regarded as" disabled, as it attempts to show that the employer believed or perceived that

Rubano was unable to perform his job because of his mental impairment. That is no longer the test.[8]

Based on Congress' mandate to broadly construe the definition of disability, the Court finds that Rubano's depression constitutes a mental impairment under the ADA, defined as "[a]ny mental or psychological disorder, such as an intellectual disability (formerly termed "mental retardation"), organic brain syndrome, emotional or mental illness, and specific learning disabilities." 29 C.F.R. §1630.2(h)(2) (2012). Clearly, Rubano's documented history of depression, which necessitated two FMLA leaves for clinical and pharmaceutical treatment in 2010 and 2011, constitutes a mental impairment under the ADA. The District's argument to the contrary lacks merit as it is based on the pre-2008 amendments to the ADA.[9]

In addition, the evidence shows that Rubano's depression was neither transitory nor minor. An impairment is considered transitory if it has an actual or expected duration of six months or less. 42 U.S.C. §12102(3)(B). Rubano testified that he began feeling symptoms of depression in 2002, and that those symptoms persisted, with varying degrees of intensity, between 2002 and 2009. Rubano further testified that his symptoms increased in severity during times of stress and that in June 2009, his working conditions began to affect his depression. The certification by Dr. Scott in support of Rubano's request for FMLA leave submitted in late May of 2010 indicates that Rubano's "depression is chronic but the acute elevation of this condition related to work stressor produced a psychological collapse." Certification of Health Care Provider dated 5/18/10 at 1, ECF No. 33-12 at 8. Dr. Scott further stated that the required

---

[8] The new ADAAA disability standard for establishing disability under the "regarded as" prong removed the requirement that the impairment substantially limits a major life activity. Rubano's articulation of the standard in essence reinserts the substantially limits requirement into the standard.

[9] The District's argument inappropriately focuses on whether Rubano's impairment substantially

treatment for Rubano's depression during FMLA leave would consist of "[i]n depth psychotherapy, crisis intervention counseling, plus evaluation of the need for hospital stay and psychopharmacology" and was to be provided three times a week over a 10-week period. *Id.* at 2, ECF No. 33-12 at 9. Rubano's actual FMLA leave began on June 15, 2010 and ended on September 27, 2010. In April of 2011, Rubano's depression was exacerbated when he learned that Harkless had been withholding his mail since as early as May of 2010, necessitating a second FMLA leave, beginning on May 7, 2011 for sixty days. In light of this undisputed evidence, the Court finds that Rubano's depression was neither transitory nor minor.

Having determined that Rubano's depression constitutes a mental impairment under the ADA, the Court must now determine whether he was subjected to a prohibited action because of that mental impairment. The record evidence shows that Rubano submitted his request for FMLA leave sometime between May 18, 2010 and June 1, 2010 to the School Board, which was approved on June 14, 2010. Included in that submission was supporting documentation from Rubano's treating physician, Dr. Scott, detailing the nature of his depression and required treatment. In addition to the School Board, Dungee, Lora Adams-King, the superintendent, and the District Solicitor, Jim Nevant, were aware of his request for FMLA leave, at the latest, by June 14, 2010. Dungee Letter to Rubano, Ex. L, Def.'s App., ECF No. 33-12.

Viewing the evidence in the light most favorable to Rubano, the Court finds that Rubano has raised a genuine issue of material fact as to whether he was subjected to any of the alleged prohibited actions because of his mental impairment. After the 2008 amendments to the ADA definition of disability, all that an ADA plaintiff must show to raise a genuine issue of material fact for the "regarded as" prong is that a supervisor knew of the purported disability. *Mengel v.*

---

limits a major life activity.

*Reading Eagle Co.,* Civ. A. No. 11-6151, 2013 WL 1285477, at *4 (E.D.Pa. Mar. 29, 2013) (citing *Estate of Murray v. UHS of Fairmount, Inc.,* Civ.A. No. 10-2561, 2011 WL 5449364, at *9 (E.D.Pa. Nov. 10, 2011)). In *Estate of Murray*, the district held that "[b]ecause the ADAAA no longer requires a showing that [the plaintiff's] impairment was perceived to substantially limit a life activity, . . . a genuine issue of material fact [had been raised] as to whether [the plaintiff] was regarded as disabled by [the employer] under the ADAAA" where the employee has shown that her supervisors knew of the purported disability. 2011 WL 5449364, at *9.

The Court notes that contrary authority exists in a recent decision by our sister court in *Kiniropoulos v. Northampton County Child Welfare Service,* 917 F.Supp.2d 377, 386 (E.D.Pa. 2013). In discussing the "regarded as" definition of disability, the *Kiniropoulos* court opined that "'the mere fact that an employer is aware of an employee's impairment is insufficient to demonstrate either that the employer regarded the employee as disabled or that that perception caused the adverse employment action.'" *Id.* (quoting *Kelly v. Drexel Univ.,* 94 F.3d 102, 109 (3d Cir. 1996)). This Court does not find *Kiniropoulous* to be persuasive as the district court relied on *Kelly,* which was decided under the pre-ADAAA standards. The Court finds that the court of appeals would likely find that *Kelly* and its progeny are inapposite to situations such as the one presented here where the relaxed standard for "regarded as" disability applies.

Accordingly, with regard to his claims under the ADA, because the undisputed evidence shows that Rubano suffered from a non-transitory mental impairment which was not minor, and the District knew of his mental impairment, Rubano has raised a genuine issue of fact for the jury as to whether he was disabled under the new ADAAA standard of disability.

### b. *Disability Under the PHRA*

As mentioned above, Rubano's PHRA claims must be evaluated under the pre-2008 amendments to the ADA. Under that version of the ADA, an individual is "regarded as" having a disability if he:

> (1) Has a physical or mental impairment that does not substantially limit major life activities but is treated by the covered entity as constituting such limitation;
>
> (2) Has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or
>
> (3) Has [no such impairment] but is treated by a covered entity as having a substantially limiting impairment.

29 C.F.R. §1630.2(*l*) (Effective to May 23, 2011). *See also Eshelman v. Agere Systems, Inc.,* 554 F.3d 426, 434 (3d Cir. 2009) (quoting *Taylor v. Pathmark Stores, Inc.,* 177 F.3d 180, 187 (3d Cir. 1999)).

Rubano does not separately address whether he has established that he is disabled under the PHRA in his opposition brief. However, in advancing his argument that he meets the new ADA disability standard under the regarded as prong, Rubano argues that the evidence shows that the District treated him differently after he applied for FMLA leave and disclosed his condition, which he maintains is sufficient to establish that Harkless did not believe that Rubano was still capable of fully performing his job after he returned from leave, and thus, that Harkless regarded him as disabled. This argument suggests that either subsection (1) or (2) of Section 1630.2(*l*) may be implicated here.

Under the PHRA "regarded as" standard, the relevant inquiry is whether the District perceived Rubano as disabled within the meaning of the PHRA and thus, is a question of intent, and not whether Rubano was actually disabled at the time of the adverse employment actions.

*Eshelman,* 554 F.3d at 434 (citing *Capobianco v. City of New York,* 422 F.3d 47, 57 (2d Cir. 2005)). "[T]he mere fact that an employer is aware of employee's [visible walking] impairment is insufficient to demonstrate either that the employer regarded the employee as disabled or that that perception caused the adverse employment action" under the pre-ADAAA standard. *Kelly,* 94 F.3d at 109; *see also Rinehimer,* 292 F.3d at 382 (applying pre-2008 version of ADA and holding that the "awareness that an employee is sick combined with some change in his work assignments is not enough to satisfy the 'regarded as' prong of the ADA".[10])

In addition to showing that his employer perceived him to be disabled, to succeed on his PHRA claim Rubano must also show that his employer believed that his perceived disability substantially limits a major life activity. *Eshelman,* 554 F.3d at 434 (citing *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 490 (1999), superseded by statute, 42 U.S.C. §12101 (2009)[11]). The EEOC regulations define major life activities as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. §1630.2(i).[12] In the case at bar, because Rubano did not apply the pre-ADAAA standard to his PHRA claims, he did not specifically identify the major life activity which the District "regarded as" being substantially limited by his mental impairment. Nonetheless, it appears that the one that can be inferred generally from Rubano's arguments is the major life

---

[10] In *Rinehimer,* the court of appeals found that the plaintiff failed to show that his employer believed that he could not perform a wide array of jobs based on the record evidence, which showed that the employer had the plaintiff perform various jobs after he returned from his absence due to pneumonia, although he did not return to his former position because, in light of his pulmonary condition, he was not able to wear a respirator and he had not been released by his doctor to work around dust and fumes. 292 F.3d at 379, 382.

[11] *See also* ADAAA §2(b)(3), Pub. L. 110-325, S. 3406, 122 Stat. 3553 (2008).

[12] The citations to the regulations, in particular, 29 C.F.R. §1630.2, are to the version in effect in 2008 through 2010, which pre-dates the changes to §1630.2 resulting from the enactment of the ADAAA. The amended regulations took effect on May 24, 2011.

activity of working. Moreover, the District's argument proceeds under the assumption that "working" is the major life activity implicated here.

The District argues that Rubano has presented no evidence even intimating that the District perceived him as having a disability, and therefore, his PHRA claim is legally deficient. In support, the District submits that it is undisputed that the District first received notice of his mental impairment when Rubano applied for FMLA leave between May 11, 2010 and June 1, 2010, and that neither the District, its School Board, nor any of its current administrators were aware of his depression prior to receipt of his FMLA leave request. The District further contends that Rubano admits that the harassment began in January of 2009, which included the alleged defamation by Cimoric, being assigned to work alone on a difficult (press box) project, and being discouraged from applying for Harkless' job, all because of a conflict with Cimoric, who wanted Rubano fired because of a past conflict she had with Rubano's brother when he was superintendent. It is also undisputed that before the District and any of its administrators were aware of his depression, Rubano's harassment worsened in March of 2010, immediately after Harkless was hired. Indeed, in his first conversation with Harkless after he was hired, Rubano was told by Harkless that he was there to shake things up with regard to Rubano. (Rubano Dep. at 125-26.) The District also points out that Rubano filed his first union grievance complaining about the harassment by Harkless on April 25, 2010, several weeks *before* he submitted his FMLA leave request. After Rubano returned from FMLA leave in late September of 2010, he testified that his working conditions remained the same. Thus, the District maintains that there is no evidence to suggest, much less prove, that its perception of Rubano changed, in any capacity, after it was informed about his depression.

In opposition, Rubano attempts to show that the District changed its perception of him

after it learned of his depression, by proffering evidence which he contends shows that the District treated him differently after he applied for FMLA leave and disclosed his condition. First, Rubano proffers that within a month of the time he submitted his request for FMLA leave, the District made the decision to demote him to team leader. However, the record does not show when the decision to demote Rubano was made, let alone that it was made after he disclosed his depression.[13] When asked at his deposition when the demotion occurred, Rubano testified that "[i]t was between June 15th . . . [and] the end of June 30th where they made that decision." Rubano Dep. at 84-85. It is important to note that the question Rubano was asked was when did the *demotion occur*, not when was the decision to demote him made. In addition, Rubano was

---

[13] With regard to Rubano's alleged demotion while he was on FMLA leave, the District does not address this claim in either its opening or reply brief. However, in its Response to Plaintiff's Statement of Additional Material Facts (ECF No. 41), the District admits that on July 1, 2010, Rubano was demoted to Team Leader and that he received the paperwork concerning his demotion while on FMLA leave, but denies that the decision to demote Rubano was made in June 2010. Def.'s Resp. to Pl.'s Stmt. Add'l Mat. Facts, ¶60 (ECF No. 41). The District contends that Rubano did not testify regarding, nor did he claim to have knowledge of when the decision was made. *Id.* At his deposition, Rubano testified:

> Q.    And that occurred at the same time the shift from foreman to team leader occurred.
> A.    Yes.
> Q.    . . . Did that occur in 2010? I mean, it occurred after Dan Harkless was hired in 2010, correct?
> A.    Correct.
> Q.    Was that in that March-to-June time frame when that demotion occurred; in other words, before your leave?
> A.    It was between June 15th. It was to the –
> Q.    Right.
> A.    -- end of June 30th where they made that decision.
> Q.    I understand.
> A.    And then I received that paperwork when I was on a medical leave.

Rubano Dep. at 84-85.

not asked how he came to know when the decision was made to demote him, nor does the record contain any testimony by the decision makers or other evidence which shows when the District made the decision to demote him. Rather, the evidence suggests that the decision was likely made at or around the time Harkless was hired, as it is undisputed that he was hired to shake things up with regard to Rubano. It is also undisputed that Cimoric wanted Rubano fired as far back as 2009. Therefore, at most, Rubano's testimony suggests only that he was *informed* of the demotion sometime between June 15th and June 30th.

Even if the evidence showed (or raised an issue of fact as to whether) the decision to demote Rubano was made after the District learned of his depression, the changes Rubano alleges resulted from the demotion were actually put into place before the District learned of his depression. For example, although after the demotion Rubano went from a salaried employee to an hourly employee, his base wages remained the same, as he was paid at the same hourly rate as when he was a salaried employee. (Rubano Dep. at 83-84.) Rubano saw his wages decrease, however, after being demoted from foreman to team leader due to a reduction in overtime pay, as did all of the maintenance employees, as a result of Harkless taking on some of the work, and the District outsourcing some of the work or hiring part-time workers to perform it. Rubano's pay was also reduced because he no longer received stipends for performing pool testing and playground inspections, but those responsibilities were removed before he requested FMLA leave. Indeed, the reduction in overtime and removal of testing/inspection responsibilities began shortly after Harkless was hired in March and April of 2010, *prior* to the submission of Rubano's FMLA leave request. Rubano also testified that he lost two weeks pay for June 15-30, 2010, when the transition was made from salaried to hourly pay (Rubano Dep. at 84); however, there is no evidence to suggest that this resulted from anything other than a miscalculation on the part of

the business manager, Dungee.

Next, Rubano contends that before his FMLA leave, all maintenance workers were subjected to the same work conditions—reduction in overtime/pay, increased work assignments—but after he returned from leave, he was singled out. Specifically, Rubano points to two incidents that occurred after he returned from FMLA leave which he contends show that his working conditions/harassment worsened after he returned from FMLA leave, despite his deposition testimony that the working conditions were the same during the two hostile work environment periods, Rubano Dep. at 135-36. Rubano now argues in his opposition brief that after he returned from FMLA leave, the working conditions were different—he was assigned to work alone on the Hechter Building project and was not permitted to leave, and he was kept off the overtime list completely. However, these so-called differences involve the same types of harassment that occurred prior to his request for FMLA leave. The undisputed evidence shows that before his FMLA leave, Rubano, as well as his co-workers, complained of reduced overtime opportunities, a substantial increase in work orders, and being assigned to work alone on projects that would normally require several people to complete.[14] While the specific discrete acts may have differed to a certain extent, the nature of the harassment—Rubano was still assigned to work on projects alone and his overtime was reduced— did not change; only the specific work assignment and extent of the overtime reduction changed.[15] In addition, the evidence shows that

---

[14] *See* Pl.'s Resp. to Def. CSMF ¶47, ECF No. 36 (citing Def. CSMF ¶32; Rubano Dep. at 64-65, 89-90; Fry Dep. at 18-19 (ECF No. 33-8); Myers Dep. at 12-13 (ECF No. 33-14)).

[15] As to the overtime list, Rubano testified that Harkless kept his name off of the list after his return from FMLA leave, despite Harkless' representation that District "keep[s] a list of who has opportunity to have overtime. It's equalized among all the employees based on an ongoing list. . . . The person who has had—there's a list that's developed for each overtime opportunity, and the—when the overtime opportunity comes up, the person who has the lowest number of previous opportunity for overtime is offered the assignment." Harkless Dep. at 27-28 (ECF No. 33-6). However, Rubano further testified that the reduction in overtime opportunities was due

28

Rubano's co-workers, Myers and Fry, were also subjected to these work conditions after Rubano returned from FMLA leave. Indeed, their testimony suggests that it continued, as both testified that the stressful work environment played a role in their decisions to retire in 2011 and 2012. Fry Dep. at 16, 29; Myers Dep. at 11. Moreover, Myers testified that Harkless' practice of sending them out on jobs alone applied to everyone in the maintenance department, but that there were times when he felt that Rubano was singled out. Myers Dep. at 20. However, Rubano admitted that it was the District's intent all along to single him out—the District wanted him to apply for the Director of Buildings and Grounds position (which was eventually filled by Harkless), a non-union position in November 2009, so they could fire him; and Harkless told him soon after he was hired in March 2009 that he was there to shake things up vis a vis Rubano. Therefore, the evidence shows that Rubano was singled out before he submitted his FMLA request. Thus, no reasonable jury could find that the alleged harassment of Rubano was worse after he returned from FMLA leave.

Third, Rubano proffers the withholding of Rubano's mail by Harkless. Although his letter to the School Board indicates that Harkless began withholding his mail in May of 2010, Rubano argues that at his deposition he stated that the opened mail dated back to November of 2010, shortly after he returned from FMLA leave. Whether the withholding of his mail began in May or November of 2010 is not material because the District made the decision to remove his inspection and testing duties prior to his request for FMLA leave. Rubano further contends that it would have been in the District's best interest to have him retain his certifications rather than hire an outside firm to do it, and that Harkless, knowing the certifications were going to expire

Harkless' determination that certain overtime tasks (e.g., opening and closing the school for various sporting events), were not maintenance functions, and were performed either by Harkless or part-time workers. Rubano Dep. at 96-98. Also, Rubano testified that Harkless does not post

and allowing that to happen, clearly did not want Rubano to perform the work, and the only possible reason for such action is that Harkless did not believe Rubano could perform the work. To the extent Rubano is challenging the soundness of the District's business decision to reorganize the maintenance department, his focus is misplaced, as "[t]he question is not whether the employer made the best, or even a sound business decision; it is whether the real reason is [discrimination].'" *Keller v. Orix Credit Alliance, Inc.,* 130 F.3d 1101, 1109 (3d Cir. 1997) (en banc)(quoting *Carson v. Bethlehem Steel Corp.,* 82 F.3d 157, 159 (7th Cir. 1996)). Here, the evidence does not show that the real reason is discrimination. Rather, the evidence shows that the District was out to get Rubano starting in 2009. In addition, the decision to take away Rubano's certifications was made before he requested FMLA leave, as those responsibilities were partially removed in April 2010, before he requested FMLA leave, and removed completely shortly after he returned from FMLA leave. Accordingly, Rubano no longer needed these certifications to do his job as Team Leader due to the reorganization of the maintenance department. Therefore, the fact that the certifications may have lapsed due to his mail being withheld by Harkless does not show or infer that the District changed its perception of him after it learned of his disability.

Finally, Rubano contends that Harkless prevented him from carrying out playground inspections on the weekends to prevent the expenditure of overtime, but Rubano continued to do the inspections during normal working hours until he went on FMLA leave. Shortly after returning from leave, Rubano submits Harkless began to perform the inspections even though he was not certified to do so. However, the evidence suggests that these duties were removed, at least in part, as a fiscal measure, to reduce the amount of overtime by outsourcing some of the

_____

overtime opportunities any longer for playground work or pool certifications. *Id.* at 98.

work until Harkless obtained the necessary certifications to do the inspections himself. *See* Note 5, *supra.* More importantly, the removal of the inspection responsibilities was implemented *before* the District was informed of his mental impairment, *see id.,* and therefore, does not show, nor can it be inferred therefrom, that the District treated Rubano differently with respect to the inspections because of his depression.

Accordingly, the Court finds that no reasonable jury could find that the District changed its perception of Rubano after it learned of his depression, based on Rubano's proffered evidence.

The District also argues that Rubano has failed to present any evidence to show that it perceived that he could not perform wide variety of job functions, as required to establish that the District regarded him as disabled. In fact, the District contends that the evidence shows the opposite to be true—Rubano was performing the same essential job functions when he returned from FMLA leave as before—and therefore, he cannot establish that the District regarded him as disabled. The Court agrees with the District.

The applicable EEOC regulation provides the following guidance on the major life activity of working:

> The term substantially limits means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.

29 C.F.R. §1630.2(j)(3)(i) (2001). In determining whether a plaintiff is substantially limited in the major life activity of "working," the court may consider the following factors:

> (A) The geographical area to which the individual has reasonable access;

(B) The job from which the individual has been disqualified because of an impairment, and the number and types of jobs utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (class of jobs); and/or

(C) The job from which the individual has been disqualified because of an impairment, and the number and types of other jobs not utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (broad range of jobs in various classes).

29 C.F.R. §1630.2(j)(3)(ii)(A)-(C) (2001). Whether an individual is substantially limited in a major life activity involves a question of fact. *Williams v. Phila. Hous. Auth. Police Dep't,* 380 F.3d 751, 763 (3d Cir. 2004).

The record evidence here shows unequivocally that Rubano continued to perform essentially the same job functions after he returned from FMLA leave as before. Although Harkless took away Rubano's responsibility for pool testing and playground inspections, this was implemented in part before his FMLA leave began and was eventually taken away completely after he returned from leave. *See* Note 5, *supra*. Moreover, the evidence suggests that these duties were removed as part of the reorganization of the maintenance department and assigned to Harkless, in order to reduce the amount of overtime by outsourcing some of the work until Harkless obtained the necessary certifications to do the inspections himself. *Id.* Even giving Rubano the benefit of all reasonable inferences, at most, the removal of responsibility for pool testing and playground inspections does not demonstrate an inability to perform his maintenance job in general, which he continued to perform full-time after he returned from FMLA leave. Thus, the record evidence does not demonstrate that Rubano was significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities, or at least

raise a genuine issue of fact on this point. Perhaps more importantly, the removal of the testing and inspection responsibilities was implemented *before* the District was informed of his mental impairment, and therefore, the District could not have believed that he was unable to perform these two tasks because of his mental impairment.

Accordingly, the Court finds that no reasonable jury could find that Rubano is disabled under the PHRA, and therefore, the District is entitled to judgment as a matter of law on Rubano's disability based claims under the PHRA.

> **2.      Rubano's Prima Facie Case of Discrimination and Hostile Work Environment/Harassment Based on Disability**

That does not end the inquiry as to Rubano's ADA claims, however, because an individual claiming disability discrimination and/or hostile work environment based on disability still bears the burden of establishing a prima facie case.

To establish a prima facie case of disability discrimination under the ADA, the employee must show that he (1) is a disabled person within the meaning of the ADA; (2) is qualified to perform the essential functions of his job, with or without reasonable accommodations, and (3) has been subjected to an adverse employment action as a result of discrimination.    *Sulima v. Tobyhanna Army Depot,* 602 F.3d 177, 185 (3d Cir. 2010) (citing *Taylor v. Phoenixville Sch. Dist.,* 184 F.3d 296, 306 (3d Cir. 1999)); *Gaul v. Lucent Techs., Inc.,* 134 F.3d 576, 580 (3d Cir. 1998) (citation omitted).   A discrimination claim under the ADA is analyzed under the familiar burden shifting of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973), and *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981).   *Wishkin v. Potter,* 476 F.3d 180, 185 (3d Cir. 2007).   Under this framework, initially, the plaintiff bears the burden of establishing a prima facie case of discrimination. *Id.* (citing *McDonnell Douglas,* 411 U.S. at 802).   If the plaintiff

successfully establishes a prima facie case, the burden then shifts to the employer to articulate some legitimate non-discriminatory reason for the adverse employment action. *Id.* Once the employer carries its burden, the burden then shifts back to the plaintiff to prove by a preponderance of the evidence that the legitimate reasons proffered by the employer were merely a pretext for discrimination, and not the true motivation for the adverse employment action. *Id.* (citing *Burdine*, 450 U.S. at 252-53; *McDonnell Douglas,* 411 U.S. at 804).

To succeed on a claim for harassment based on disability, the plaintiff must show that: "(1) [he] is a qualified individual with a disability under the ADA; (2) [he] was subject to unwelcome harassment; (3) the harassment was based on h[is] disability or a request for accommodation; (4) the harassment was sufficiently severe or pervasive to alter the conditions of h[is] employment and to create an abusive working environment; and (5) [the employer] knew or should have known of the harassment and failed to take prompt effective remedial action." *Walton v. Mental Health Ass'n of S.E. Pa.,* 168 F.3d 661, 667 (3d Cir. 1999) (citing *McConathy v. Dr. Pepper/Seven Up Corp.*, 131 F.3d 558, 563 (5th Cir.1998); *Vendetta v. Bell Atlantic Corp.*, No. CIV.A. 97–4838, 1998 WL 575111, at *9 (E.D.Pa. Sep. 8, 1998)) (footnote omitted).

In the instant matter, the motion for summary judgment focuses on the same two elements of each claim: (1) whether Rubano is an individual with a disability under the ADA; and (2) whether the alleged harassment and adverse employment actions were based on his perceived disability.[16] Because it has already determined that Rubano has satisfied the first element, the Court turns now to the parties' arguments as to the second element—causation.

---

[16] Solely for the purpose of the pending summary judgment motion, the Court assumes without deciding that the other other requirements of a prima facie claim of disability discrimination and harassment have been met.

To survive summary judgment, Rubano "must provide evidence that supports a logical inference of causation between the alleged disability and the adverse employment action[]" and/or harassment. *Mengel,* 2013 WL 1285477, at *4 (citing *Purcell v. Pa. Dep't of Corrections,* Civ. A. No. 11-181J, 2006 WL 891449, at *13 (W.D.Pa. Mar. 31, 2006) ("A cause of action under the . . . ADA requires proof, inter alia, that the claimed discrimination occurred as a result of the [plaintiff]'s disability.") (citing *Yeskey v. Pa. Dep't of Corrections*, 118 F.3d 168 (3d Cir.1997), *aff'd*, 524 U.S. 206 (1998))).

The District contends that Rubano has failed to identify a single piece of direct evidence to link his alleged harassment to his disability under the ADA, nor has Rubano met his burden of producing indirect evidence from which a reasonable factfinder could conclude that the facially neutral harassment stemmed from his disability. In support, the District points out that the incidents of harassment began in 2009, well before the District allegedly had knowledge of his disability. With regard to his alleged mistreatment after he requested FMLA leave in May 2010, the District argues that simply presenting evidence that the alleged incidents of mistreatment continued to occur after he requested FMLA leave is not enough to satisfy his burden of presenting evidence that he suffered unwelcome harassment *because of his disability*, especially in light of Rubano's testimony that the overall nature of the harassment was the same both before and after he requested FMLA leave. In any event, the District submits that the record contains ample evidence of other possible explanations for the alleged harassment—the personal conflict between Rubano and Cimoric, which manifested in Cimoric's alleged defamation of Rubano, the assignment of a difficult (press box) project, and Stabile's discouraging Rubano from applying for the Director of Building and Grounds position—all of which occurred in 2009; and Rubano's

statement that Harkless told him shortly after he was hired in March 2010 that he (Harkless) was hired to shake things up with regard to Rubano.

In opposition, Rubano submits that following his return from FMLA leave, the working conditions were different and that he was singled out. In support, he proffers the same evidence and arguments as those discussed with regard to whether he was "regarded as" disabled under the PHRA. *See* Discussion *supra* at 25-31.

The analysis for determining whether Rubano has established the prima facie element of causation is essentially the same as that applied for determining whether he was "regarded as" disabled under the PHRA. As the Court has already determined that no reasonable jury could find that the District engaged in the alleged harassment and demoted him because it perceived him to be disabled under the PHRA, the Court finds that no reasonable jury likewise could find that the District harassed and demoted him based on his alleged disability. "'A personality conflict doesn't ripen into an ADA claim simply because one of the parties has a disability.'" *Walton,* 168 F.3d at 667 (quoting *Uhl v. Zalk Josephs Fabricators, Inc.,* 121 F.3d 1133, 1137 (7th Cir. 1997)). Clearly the relationship between Rubano and Harkless was poor, but Rubano has not asserted facts that would allow a reasonable jury to find that Harkless harassed him because of his disability. Therefore, Rubano has failed to establish a prima facie claim of disability based discrimination and harassment under the ADA.

### 3. The District's Legitimate, Non-Discriminatory Reasons for the Adverse Actions

The District further argues that even if Rubano could establish a prima facie case of discrimination and harassment under the ADA, it has articulated legitimate, non-discriminatory reasons for such actions. Specifically, the District maintains that the adverse employment actions—reduced overtime and less than desirable tasks—began long before the District knew of

Rubano's alleged disability and were part of Harkless' reorganization plan for the District's maintenance department. The District also points to Harkless' testimony that he administered overtime in a manner that was designed to equalize the opportunities for overtime amongst all District personnel. In addition, the District proffers that Rubano was not the only employee to experience a cut in overtime and reassignment of duties, citing Myers' testimony that all employees in the maintenance department saw a reduction in income after Harkless was hired. Finally, the District points to Dungee's testimony that additional work was given to part-time employees, thus reducing the amount of overtime paid to full-time employees, because it was less expensive for the District to hire a part-time employee to complete that work. The District maintains that these were all aspects of the plan to overhaul the District's maintenance department.

The Court finds that the District has articulated legitimate, non-discriminatory reasons for the alleged adverse employment actions. Thus, under the *McDonnell Douglas* burden shifting analysis, Rubano must now show that the reasons proffered by the District are just a pretext for unlawful disability discrimination.

### 4. Whether the District's Reasons Were a Pretext for Unlawful Discrimination

To survive a motion for summary judgment at the third step of the burden shifting analysis, Rubano must present some evidence, either direct or circumstantial,[17] from which a jury

---

[17] With regard to circumstantial evidence, the court of appeals explained:

> To establish such circumstantial proof, the plaintiff first must present evidence that each of the defendant's reasons is pretextual, viz, each reason was "a post hoc fabrication or otherwise did not actually motivate the employment action." *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir.1994). This proof of pretext then may be combined by the factfinder with the evidence used to support the

could reasonably either: "(1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie,* 32 F.3d 759, 764 (3d Cir. 1994) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510-11 (1993); *Ezold v. Wolf, Block, Schorr & Solis-Cohen,* 983 F.2d 509, 523 (3d Cir. 1992)). In the case at bar, Rubano is proceeding under the first prong of *Fuentes*.

The first prong of *Fuentes* focuses on whether Rubano has submitted evidence from which a fact-finder could reasonably disbelieve the District's articulated legitimate reasons for the alleged harassment and demotion. To satisfy this prong and discredit the District's proffered reasons, Rubano:

> cannot simply show that his employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." Rather, [Rubano] must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them "unworthy of credence," and hence infer "that the employer did not act for [the asserted] non-discriminatory reasons."

*Id.* at 765 (quoting *Ezold*, 983 F.2d at 531) (other internal quotations omitted). In other words, Rubano must prove "not merely that [the District]'s proffered reason was wrong, but that it was so plainly wrong that it cannot have been [the District]'s real reason." *Keller,* 130 F.3d at 1109. Thus, in analyzing this prong, "'federal courts are not arbitral boards ruling on the strength of 'cause' for [the adverse action]. The question is not whether the employer made the best, or

---

> plaintiff's prima facie case of age discrimination, and from this union, the factfinder may reasonably infer that the defendant discriminated against the plaintiff because of his age. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993).

even a sound business decision; it is whether the real reason is [discrimination].'"  *Id.* (quoting

*Carson,* 82 F.3d at 159).

Rubano asserts three indicia of weakness, implausibility, and/or inconsistency in the District's proffered reasons, which he contends are sufficient to create a genuine issue of material fact on the issue of pretext.  First, Rubano takes issue with the District's explanation that every category of alleged adverse employment action began before he informed the District of his depression and that the actions applied to all maintenance department employees equally. Rubano argues that after he returned from FMLA leave, his opportunities for overtime were not only reduced, as was the case for all employees in the maintenance department, but that Harkless singled him out by keeping him off of the overtime list completely.  Rubano contends that the District has not offered any justification for this action.  The Court disagrees, for the same reasons as those stated *supra* in Part III.A.1.b. at 28-29 and at Note 15.

Next, Rubano argues that no rational reason exists for intentionally allowing the certifications, which would allow an employee to legally perform specialized work such as spraying weed killer during normal working hours, to lapse and then hire an outside company to perform the task.  Likewise, Rubano submits that no rational basis exists for stripping Rubano of his playground inspection duties when he was the only person certified to conduct such inspections.  The Court finds that no reasonable jury could disbelieve the District's legitimate reasons based on this evidence.  Rather, the evidence shows that Harkless partially removed Rubano's duties for inspections and pool testing  in April of 2010, so the decision to do so had to be made at that time or prior thereto.  There is no evidence to suggest *when* the weed killing duties, in particular, were removed.  The record does show that in April of 2010, Rubano

---

*Ryder v. Westinghouse Elec. Corp.,* 128 F.3d 128, 136 (3d Cir. 1997) (footnote omitted).

complained to Harkless in an email about the outsourcing of lawn care to a third party contractor. (Ex. K, Def.'s App., ECF No. 33-11.)[18]  Moreover, the District made a business decision to reorganize the maintenance department, which necessitated the removal of inspection and testing duties from Rubano.  Thus, there was no longer any need for Rubano to maintain those certifications.  The soundness of that decision is not at issue here, but only whether the decision to remove those responsibilities was motivated by discrimination.  As the decision to remove the duties was made prior to Rubano's request for FMLA leave, that decision could not have been based on his disability, and therefore, not motivated by discrimination.   Rather, the evidence shows that the likely reason for removal of those duties was the reorganization of the maintenance department and/or the personal animosity between Cimoric, Harkless and Rubano.

Finally, Rubano submits that while there might have been a good reason to assign him to perform renovations at the Heckter Building, a rational reason does not exist for isolating him at the work site by prohibiting him from leaving, even to fetch needed supplies.  Again, this is a distinction without a difference and, as such, a jury could not reasonably disbelieve the District's legitimate reasons.  Rubano, as well as the other maintenance department employees, were required to work alone both before and after he requested FMLA leave.  Also, as discussed above, Rubano was singled out *before* he requested FMLA leave because of a personal animosity stemming from a conflict between Cimoric and the prior superintendent.  The fact that he continued to be singled out after he returned from FMLA leave, without any other evidence from

_____

[18] Moreover, the dispute about the reduction in overtime due to outsourcing or hiring part-time workers to  perform work previously performed by Rubano and the other full-time maintenance department employees, appears to be an issue governed by the collective bargaining agreement and not the ADA.  Importantly, the 5/4/10 email points out that under the CBA, the District was not obligated to provide overtime to union employees.  *See* Note 3, *supra.*

which a discriminatory motive can be inferred, does not show or suggest that the District's articulated reason is unworthy of credence.

Accordingly, the Court finds that based on the foregoing evidence proffered by Rubano, no reasonable jury could find that the District's articulated legitimate reasons were unworthy of credence, and thus, could infer that the District acted for discriminatory reasons. Therefore, the District is entitled to judgment as a matter of law on Rubano's discrimination and harassment claims under the ADA.

**B.      Retaliation Under The ADA and PHRA**

The ADA contains the following prohibition against retaliation:

> No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.

42 U.S.C. §12203(a). The PHRA contains a substantially similar anti-retaliation provision. *See* 43 Pa. Stat. §955(d).[19] The court of appeals has held that the "PHRA is to be interpreted as identical to federal anti-discrimination laws except where there is something specifically different in its language requiring that it be treated differently." *Fogleman v. Mercy Hosp., Inc.,* 283 F.3d 561, 567 (3d Cir. 2002) (citation omitted). As there is nothing in the language of Section 955(d) to warrant different treatment, the Court will apply the same federal standard to Rubano's PHRA retaliation claim. *Warshaw v. Concentra Health Servs.,* 719 F.Supp. 2d 484, 503-04 (E.D.Pa. 2010) (citing *Fogleman, supra*).

---

[19] Section 955 provides in relevant part: "It shall be an unlawful discriminatory practice . . . (d) For any person, employer, employment agency or labor organization to discriminate in any manner against any individual because such individual has opposed any practice forbidden by this act, or because such individual has made a charge, testified or assisted, in any manner, in any investigation, proceeding or hearing under this act." 43 Pa. Stat. §955(d).

To establish a prima facie case of retaliation under the ADA, a plaintiff must adduce evidence of: "(1) protected employee activity; (2) an adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." *Weaver v. County of McKean,* Civ. A. No. 1:11-cv-254, 2012 WL 1564661, at *5 (W.D.Pa. Apr. 9, 2012) (citing *Krouse v. Am. Sterilizer Co.,* 126 F.3d 494, 500 (3d Cir. 1997)). A claim for retaliation under the ADA is analyzed under the familiar burden-shifting framework set forth in *McDonnell Douglas* and *Burdine.* *Krouse,* 126 F.3d at 500-01. In the case at bar, the District seeks summary judgment on Rubano's retaliation claim based solely on its contention that Rubano has failed to establish a prima facie case of retaliation.[20]

Initially, the District argues that Rubano has failed to establish the third element of the prima facie test—a causal connection between the filing of EEOC charges and the alleged mistreatment. The District submits that this element involves a highly context-specific inquiry into the motive of the employer, citing *Kachmar v. SunGard Data Systems, Inc.,* 109 F.3d 173, 178 (3d Cir. 1997). Recently, the Supreme Court held that the plaintiff must prove traditional "but for" causation to satisfy the third element of a retaliation claim. *Univ. of Texas Southwestern Med. Ctr. v. Nassar,* ___ U.S. ___, 133 S.Ct. 2517, 2533 (2013).[21] "To establish

---

[20] As neither party goes beyond the first step of the burden shifting analysis, the Court will likewise refrain from doing so with regard to the retaliation claim.

[21] Although the Supreme Court in *Nassar* was construing Title VII's anti-retaliation provision, 42 U.S.C. §2000e-3(a), the language of the ADA's anti-retaliation provision is almost identical. Neither the Supreme Court nor the court of appeals for this circuit has addressed whether the "but-for" causation test would apply to retaliation claims under the ADA. However, given the similarity of the anti-retaliation provisions, this Court predicts that the Third Circuit would likely find that the "but-for" causation analysis also applies to retaliation claims under the ADA. *See Warshaw,* 719 F.Supp. 2d at 503 (holding that Congress' use of the word "because" in the ADA anti-retaliation provision calls for "but-for" causation standard) (citing *Serwatka v. Rockwell Automation, Inc.,* 591 F.3d 957, 962 (7th Cir. 2010)).

the requisite causal connection a plaintiff usually must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) an intervening pattern of antagonism [or other evidence of retaliatory animus] coupled with timing to establish a causal link." *Lauren W. ex rel. Jean W. v. DeFlaminis,* 480 F.3d 259, 267 (3d Cir. 2007)(citing *Krouse*, 126 F.3d at 503–04; *Woodson v. Scott Paper Co*., 109 F.3d 913, 920–21 (3d Cir.1997)). "The amount of time between the protected activity and the alleged retaliation is a circumstance to be considered by a fact-finder in determining if the plaintiff has established the required causation." *Shellenberger v. Summit Bancorp, Inc.,* 318 F.3d 183, 189 (3d Cir. 2003) (footnote omitted). However, the "'mere passage of time is not legally conclusive proof against retaliation.'" *Krouse,* 126 F.3d at 503 (quoting *Robinson v. Southeastern Pa. Transp. Auth*., 982 F.2d 892, 894 (3d Cir.1993)).

The law in this Circuit is fairly well established that mere temporal proximity between the protected activity and the adverse employment action ordinarily will not be sufficient to meet the plaintiff's burden of demonstrating a causal connection between the two events, unless the interim period is so short as to be unusually suggestive of retaliatory motive. *LeBoon v. Lancaster Jewish Comm. Ctr. Ass'n,* 503 F.3d 217, 232 (3d Cir. 2007) (citing *Clark Cnty. Sch. Dist. v. Breeden,* 532 U.S. 268, 273-74 (2001) ("temporal proximity alone, when 'very close,' can in some instances establish a prima facie case of retaliation"); *Jalil v. Avdel Corp.,* 873 F.2d 701, 708 (3d Cir. 1989) (temporal proximity alone was enough to establish causation where adverse employment action occurred two days after the protected activity, and there were no allegations of wrongdoing by the employee during that time)).

Where the facts are such that temporal proximity alone is not enough to infer causation, a plaintiff can avoid summary judgment by  producing other evidence of causation, such as, for

example, producing evidence of a pattern of antagonism or retaliatory motive during the intervening period, or by showing inconsistent reasons given by the employer for the adverse employment action. *Farrell v. Planters Lifesavors Co.,* 206 F.3d 271, 280-81 (3d Cir. 2000) (citing *Kachmar,* 109 F.3d at 177 (pattern of antagonism); *Waddell v. Small Tube Products, Inc.,* 799 F.2d 69, 73 (3d Cir. 1986) (inconsistent reasons for termination)). These factors are not, however, the exclusive means of establishing causation, and absent such proof, the plaintiff may establish a causal link by showing that the totality of the evidence provides the necessary inference. *DeFlaminis,* 480 F.3d at 267 (citing *Farrell*, 206 F.3d at 281).

The District submits that a causal connection does not exist here because it is clear that the alleged adverse employment action preceded the statutorily protected activity. The District points to Rubano's union grievance complaining of harassment by Harkless in April of 2010, and reduction in overtime and change in work duties, all of which occurred weeks before Rubano submitted his FMLA leave request and months before he filed his first EEOC charge. The District also points to Rubano's testimony that there was no difference in his working conditions between the time before he filed his first EEOC charge and after he filed that charge. In light of these various admissions, the District contends that Rubano can never establish the causal connection between his protected activity and the alleged adverse employment action. As such, the District submits that Rubano's retaliation claim is legally deficient and must be dismissed.

In response, Rubano argues that the District took actions after his protected activity that differed substantially from those that occurred before. Specifically, Rubano claims that after the protected activity, he was removed from overtime completely, his mail was withheld allowing his certifications to lapse, and he was stripped of his playground inspection duties entirely. In addition, Rubano points to an incident that occurred on 9/15/12 for which he was wrongfully

issued a written reprimand.[22]  Thus, Rubano submits that all of these actions by the District

would dissuade a reasonable employee from making or supporting a claim of discrimination,

citing *Burlington Northern & Santa Fe Railway Co. v. White,* 548 U.S. 53, 68 (2006).

In determining whether a causal link can be inferred between the protected activity and

the alleged acts of retaliation, it is important to note when the protected activity occurred.

Rubano filed his first charge of discrimination with the EEOC on October 8, 2010, and filed two

subsequent charges with the EEOC on January 17, 2011 and September 19, 2011.  In its reply

brief, the District submits that Rubano has not clearly identified what new acts of harassment

occurred after his first EEOC charge was filed on October 8, 2010, but rather, focuses primarily

on whether certain events occurred after he returned from FMLA leave.  For the most part, the

Court agrees with the District.

In his Amended Complaint, Rubano lists nine actions the District allegedly took in

retaliation for his filing of EEOC and PHRC charges for discrimination.  (Am. Compl. ¶24, ECF

No. 18.)[23]  The record shows that all but one of these alleged retaliatory acts took place before

---

[22] Shortly after reporting to work on 9/15/12, Rubano informed Harkless that he was feeling ill
and had to leave early, which he did.  (Rubano Dep. at 121-23.)  Subsequently, Harkless issued a
written reprimand alleging that Rubano had failed to call off or report to work on 9/15/12 in
violation of school policy.  (*Id.*)

[23] The nine acts of retaliation alleged by Rubano are:
      a.  Stripping Plaintiff of job titles and classifications without Union
      approval;
      b.  Derogatory comments about the Plaintiff to his face and to
      others;
      c.  Assignment of impossible to follow work tasks;
      d.  Unilateral reduction in pay;
      e.  Refusal to allow the Plaintiff to take accrued sick and vacation
      time;
      f.  Hiring non union personnel to perform Plaintiff's Union
      protected job activities;
      g.  Refusal to give Plaintiff his mail thereby jeopardizing his
      certificate and license to be kept up to date;

the first EEOC charge was filed. The one exception is the withholding of Rubano's mail which, giving him the benefit of all reasonable inferences, may have begun as late as November 2010. As to the other eight alleged retaliatory acts, Rubano does not cite to any evidence in the record to show exactly which of these acts occurred after October 8, 2010, and the approximate date that the acts occurred. As Rubano bears the burden of proof in establishing a prima facie case of retaliation, merely stating in his opposition brief that the District took actions after Rubano's protected activity that differed substantially from those that came before, is not sufficient to satisfy his burden at the summary judgment stage. Speculation alone, absent specific facts or reasonable inferences, is not enough to defeat a summary judgment motion. *Griesbaum v. Aventis Pharm.*, 259 F. App'x 459, 466 n. 10 (3d Cir. 2007); *Lehman Bros. Holdings Inc. v. Gateway Funding Diversified Mortg. Servs., L.P.*, 942 F.Supp. 2d 516, 529 n. 8 (E.D.Pa. 2013) (citing *Venzie Corp. v. U.S. Mineral Prods., Inc*., 521 F.2d 1309, 1312 (3d Cir.548 1975) ("Plaintiff has burden to adduce sufficient evidence of its claims such that a jury could find for it 'on the basis of reasonable inferences and not mere speculation'").

Arguably, only two alleged acts of retaliation occurred after October 8, 2010: (1) the withholding of Rubano's mail by Harkless, and (2) the incident on September 15, 2012 that Rubano contends resulted in a wrongfully issued written reprimand. The District submits that assuming for purposes of the summary judgment motion only that these alleged categories of harassment are true, they simply do not rise to the level of material adversity necessary to support a claim for retaliation. In support, the District cites *Burlington* for the proposition that "a

---

h. Refusal to approve overtime; and
i. Other sordid acts designed to harm the Plaintiff,
including but not limited having Dan Harkless targeting the
Plaintiff for retaliation and termination and having D/H telling
others he was hired for that purpose among others.

plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." 548 U.S. at 68 (citations and internal quotation marks omitted). The District further argues that given Rubano's testimony that the alleged harassment was the same both before and after he filed his first EEOC charge on October 8, 2010, Rubano has failed to present any evidence which would support a conclusion that a causal connection exists between his exercise of protected activity and these alleged incidents of mistreatment. Therefore, the District maintains that Rubano's retaliation claims fail as a matter of law.

To establish the second element of a retaliation claim, the "plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington,* 548 U.S. at 68 (citations and internal quotation marks omitted). This is an objective standard which is judicially administrable. *Id.* In articulating this standard, the Supreme Court wanted to separate significant from trivial harms, finding only the former actionable. The Court further opined that "normally, petty slights, minor annoyances, and simple lack of good manners will not . . . deter[ ] victims of discrimination from complaining to the EEOC]." *Id.* (citing 2 EEOC 1998 Manual §8, p. 8-13).

As to the withholding of mail, the Court finds a reasonable employee would not have found this action to be materially adverse. The certifications were no longer necessary because as part of the reorganization of the maintenance department, the District removed the inspection and testing duties from Rubano, beginning in April of 2010, and while this may not have been a

---

Am. Compl. ¶24.

popular or sound business decision, a reasonable employee would not find this decision to be materially adverse. Moreover, when Rubano found out in April 2011 that Harkless had been withholding his mail, that did not deter him from filing a subsequent EEOC charge on September 19, 2011. *See Sykes v. Pa. State Police,* Civ. A. No. 05-1359, 2007 WL 141064, *6-*7 (W.D.Pa. Jan. 17, 2007) (the alleged adverse employment actions, whether characterized as major or minor, did not deter plaintiff's pursue of new and expanded allegations of discrimination, either internally or administratively, and thus, belied her argument that a reasonable person confronted with the adverse employment actions would have been dissuaded from voicing additional allegations of discrimination.)

With regard to the September 15, 2012 incident, a reasonable employee may find a wrongfully issued written reprimand to be materially adverse. Some courts have found that a written reprimand may constitute a materially adverse action. *See, e.g., Prise v. Alderwoods Group, Inc.,* 657 F.Supp. 2d 564, 621 (W.D.Pa. 2009) (citing *Genevie v. Jackson,* Civ. A. No. 05-1733, 2008 WL 793885, *14 (W.D.Pa. Mar. 24, 2008)); *Hempfling v. United Refining Co. of Pa.,* Civ. A. No. 06-334, 2008 WL 201900, *9 (W.D.Pa. Jan. 23, 2008) (holding that the "write-ups" received by plaintiff but not by a co-worker for the same conduct may "dissuade a reasonable worker from making or supporting a charge of discrimination.") Whether the written reprimand issued to Rubano was so "harmful to the point that [it] could well dissuade a reasonable worker from making or supporting a charge of discrimination," *Burlington,* 548 U.S. at 57, presents a close question. Thus, giving Rubano the benefit of all favorable inferences, the Court will assume, *arguendo,* without deciding, that the written reprimand was materially adverse.

Nonetheless, the Court finds that Rubano has failed to establish a causal link between his protected activity and the written reprimand. As noted above, Rubano can establish causation either by producing evidence of an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or an intervening pattern of antagonism [or other evidence of retaliatory animus] coupled with timing. It is clear from the record that unusually suggestive temporal proximity is lacking here, as almost one year has elapsed from the date of the last protected activity—September 19, 2011—and the date of the written reprimand—September 15, 2012. Thus, the Court must consider whether the record shows any pattern of antagonism or retaliatory motive during the intervening period. At the summary judgment stage, Rubano must point to evidence in the record which demonstrates that specific acts of antagonism occurred during the intervening period. Merely alleging that the "harassment continued" after the protected activity is insufficient and too speculative to survive summary judgment. Nor has Rubano proffered any evidence to suggest that the reasons given by the District for the written reprimand were inconsistent. Therefore, the Court finds that no reasonable jury could infer a causal link between Rubano's protected activity and the written reprimand.

Based on the foregoing, the Court finds that Rubano has failed to establish a prima facie claim of retaliation under the ADA and PHRA. Accordingly, the Court finds that the District is entitled to judgment as a matter of law on the retaliation claims, and therefore, will grant the District's summary judgment motion as to these claims.

## IV.    CONCLUSION

For the reasons set forth above, the Court finds that no genuine issues of material fact exist, and that Defendant is entitled to judgment as a matter of law as to all claims. Therefore,

the Court will grant Defendant's Motion for Summary Judgment in its entirety.

An appropriate order will follow.

Dated:   January 8, 2014                                   BY THE COURT:

                                                                    _____
                                                                    LISA PUPO LENIHAN
                                                                    Chief United States Magistrate Judge

cc:        All Counsel of Record
             *Via Electronic Mail*